UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

                                                                    x

YAJAIRA VELAZQUEZ,

                              Plaintiff,

             -against-                                              17 Civ. 842 (CM)

YOH SERVICES, LLC, CNBC, INC., CNBC, LLC,
NBCUNIVERSAL MEDIA, LLC, BRENDA
GUZMAN, individually and in her individual
capacity, JOHN AND JANE DOES 1–10,
individually and in their official capacities, XYZ
CORP. 1–10,

                              Defendants.

                                                                    x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3/15/2019

### MEMORANDUM DECISION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

McMahon, C.J.:

Plaintiff Yajaira Velazquez ("Plaintiff" or "Velazquez") brought this action against her former employer Yoh Services, LLC ("Yoh"), who hired her to provide hair and makeup services to on-air talent at the cable television network CNBC. Plaintiff also named as Defendants two of CNBC's operators, CNBC, LLC f/k/a CNBC, Inc. and NBCUniversal Media, LLC, and two supervisors at CNBC, Mary Duffy and Brenda Guzman. Plaintiff brings claims against all five Defendants for: (1) overtime wages and retaliation pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.*; (2) overtime wages, retaliation, recordkeeping violations, and failure to provide itemized wage statements, pursuant to the New York Labor Law ("NYLL"), N.Y. Lab. L. §§ 190 *et seq.*; (3) race, color, and national origin

1

discrimination in violation of the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. L. §§ 290, *et seq*.; (4) race and color discrimination in violation of 42 U.S.C. § 1981; and (5) race and color discrimination in violation of the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code §§ 8-101, *et seq*.

Before the Court is Defendants' motion for summary judgment, (Dkt. No. 97), dismissing the Amended Complaint, (Am. Compl., Dkt. No. 87), in its entirety.  For the reasons set forth below, Defendant's motion is GRANTED.

## I.     Background

The following facts are drawn from evidence in the record and the Parties' Local Rule 56.1 statements.  Because Plaintiff has stipulated to many of the facts in Defendants' 56.1 statements, the facts are almost all undisputed.

### A.     Facts

#### 1.  The Parties

Defendants NBCUniversal Media, LLC ("NBCUniversal") and CNBC, LLC f/k/a CNBC, Inc. (together, the "CNBC Defendants") operate the CNBC cable television network, which provides real-time financial market coverage and business news.  (CNBC Defs.' Statement of Undisputed Material Facts Pursuant to Local Civ. R. 56.1 ("CNBC 56.1"), Dkt. No. 99 ¶ 1.)  CNBC regularly broadcasts live for about 75 hours each week, from 4:00 a.m. ET to 7:00 p.m. ET on weekdays.  (*Id.* ¶ 2.)

Much of CNBC's programming for North America is produced at the network's global headquarters in Englewood Cliffs, New Jersey, (Decl. of Brenda Guzman in Supp. of Defs.' Mot. for Summ. J. dated June 15, 2018 ("Guzman Decl."), Dkt. No. 101 ¶ 2), but the network also broadcasts live from the New York Stock Exchange ("NYSE"), the NASDAQ MarketSite in

2

Times Square, and NBCUniversal's headquarters at 30 Rockefeller Plaza, among other places. (*Id.* ¶ 3.)  CNBC also previously broadcast live from the New York Mercantile Exchange ("NYMEX"), until the Merc closed its physical trading floor at the end of 2016.  (*Id.*)

The CNBC Defendants deny that they are "employers" of Velazquez for purposes of this action.[1]  (Defs.' Mem. of Law in Supp. of Mot. for Summ. J. ("Defs. Br."), Dkt. No. 98 at 5 n.3.)

Defendant Brenda Guzman ("Guzman"), has been a Production Manager at CNBC since 2014.  (CNBC 56.1 ¶ 4.)  Guzman manages the hair and makeup artists who service the network's anchors, reporters, and contributors, collectively known as on-air "talent."  (*Id.*) Guzman is responsible for coordinating hair and makeup artists' assignments for each broadcast day, which she does by preparing a daily schedule and circulating it to the artists the day prior to broadcast.  (Guzman Decl. ¶¶ 8–9.)  Guzman works out of CNBC's global headquarters in Englewood Cliffs, New Jersey.  (*Id.* ¶ 5.)

Guzman reports to Defendant Mary Duffy ("Duffy"), Vice President of Talent Development and Senior Executive Producer at CNBC.  (CNBC 56.1 ¶ 6.)  Duffy has worked at CNBC for 15 years, and oversees the look and brand of CNBC's talent.  (Decl. of Mary Duffy in Supp. of Defs.' Mot. for Summ. J. dated June 15, 2018 ("Duffy Decl."), Dkt. No. 103 ¶ 3.) Duffy also oversees CNBC's relationships with its contributors, who comprise more than eighty subject matter experts appearing on the network.  (*Id.*)

Defendant Yoh Services, LLC ("Yoh") is a staffing agency that contracts with CNBC to fulfill various staffing needs, including for hair and makeup artists.  (Yoh Services, LLC's Statement of Material and Undisputed Facts ("Yoh 56.1"), Dkt. No. 100 ¶ 1.)  Many of the hair

---

[1]      CNBC reserved the right to raise this defense at trial if this motion were denied.  (Defs. Br. at 5 n.3.)

and makeup artists who provide services for CNBC are Yoh employees or "Yoh contractors." (CNBC 56.1 ¶ 8.)

Plaintiff Yajaira Velazquez ("Plaintiff" or "Velazquez") is a hair and makeup artist who worked for the CNBC network as a Yoh contractor from approximately September 2014 to the end of January 2016. (*Id.* ¶¶ 20, 58.)

### 2. Velazquez's Hiring and Onboarding

Around September 2014, Velazquez, who was freelancing, was contacted by Guzman, who had been referred to Velazquez by a mutual friend. (*Id.* ¶ 19; Yoh 56.1 ¶ 2; Guzman Decl. ¶ 20.)

In September 2014, on the basis of her resume, interview, a makeup test, and references, Guzman determined that Velazquez was qualified to perform hair and makeup services for CNBC and offered Velazquez an assignment at CNBC as a Yoh contractor. (CNBC 56.1 ¶ 19; Yoh 56.1 ¶ 3.) Duffy was out on disability leave at this time, although Guzman spoke with her about engaging Velazquez. (Duffy Decl. 10:23–24; Guzman Decl. ¶ 22.)

CNBC asked that Velazquez work as a contractor through Yoh, and directed Velazquez to Yoh's staff to complete the onboarding paperwork. (Yoh 56.1 ¶ 4.) Velazquez then spoke with Tara Fields-Gomez ("Fields-Gomez"), the on-site Resource Manager for the CNBC account at Yoh, who oversees the on-boarding process for CNBC-assigned Yoh contractors. (Yoh 56.1 ¶¶ 5–6; Decl. of Tara Fields-Gomez in Supp. of Defs.' Mot. for Summ J. dated June 15, 2018 ("Fields-Gomez Decl."), Ex. A to Yoh 56.1, Dkt. No. 100-1 ¶¶ 4–5.)

Under her employment agreement with Yoh, Velazquez's regular pay rate as a Yoh contractor was $50 per hour, and her overtime pay rate was $75 per hour. (CNBC 56.1 ¶¶ 21–22.) Velazquez was to be paid overtime for all hours worked in excess of 40 hours in a given work week. (*Id.* ¶ 23.)

Velazquez did not complete the onboarding paperwork for Yoh until November of 2014. (Yoh 56.1 ¶ 10.) Until that time, CNBC paid Velazquez for her work directly by invoice and check. (*Id.* ¶ 11.)

After the onboarding process was complete, Yoh did not supervise Velazquez or provide her any instruction with respect to her work at CNBC. (*Id.* ¶ 12.)

### 3.  Velazquez's Assignment to the NYMEX and NYSE

Velazquez began her assignment at CNBC around September 30, 2014. (CNBC 56.1 ¶ 20.) Velazquez initially trained at the Englewood Cliffs headquarters, (Yoh 56.1 ¶ 9), and was eventually assigned to a split shift between NYMEX and NYSE, both located in Manhattan's Financial District. (Guzman Decl. ¶ 41.) At NYMEX, Velazquez handled hair and makeup for CNBC reporter Jackie DeAngelis ("DeAngelis"), with whom she became friends. (CNBC 56.1 ¶ 35; Decl. of Jackie DeAngelis in Supp. of CNBC Defs.' Mot. for Summ. J. dated June 15, 2018 ("DeAngelis Decl."), Dkt. No. 102 ¶ 8.)

While Velazquez's shifts varied, Guzman would most often schedule Velazquez for an 8:30 a.m. to 9:30 a.m. shift at NYMEX, followed by a 10:00 a.m. to 1 p.m. shift at NYSE. (Guzman Decl. ¶ 41; Dep. of Yajaira Velazquez ("Velazquez Dep."), Ex. 1 to the Decl. of Michael J. Puma in Supp. of Defs.' Mot. for Summ. J. dated June 15, 2018 ("Puma Decl."), Dkt. No. 104-1 at 67:4–9.)[2] Velazquez was paid for her time traveling between NYMEX and NYSE. (Guzman Decl. ¶ 41.)

---

[2]      The full transcript of Velazquez's first deposition is also annexed as Exhibits 1 and 1(a) to the Declaration of Ambrose Wotorson in Opp. re: Defs.' Mot. for Summ. J. dated August 3, 2018 ("Wotorson Decl."). (Dkt. Nos. 123-1, 123-2.) The pagination is identical to the excerpts submitted by Defendants, and the transcript from Velazquez's second deposition is continuously paginated. Therefore, all references to Velazquez's deposition testimony use the citation "Velazquez Dep."

Velazquez was sometimes assigned an additional shift, but this happened less than once a week.  (Velazquez Dep. 68:3–69:7.)

According to Velazquez, after her first year, CNBC cut her scheduled hours to 20 per week, although she regularly worked about 1.5 to 2.5 hours per week that she was not paid for. (Velazquez Dep. 149:1–150:2.)

### 4.   Alleged Uncompensated Overtime

To record their time, Yoh Contractors use Acceleration, an electronic timekeeping program provided by Agile 1.  (CNBC 56.1 ¶ 11.)  Users sometimes refer to the timekeeping system as "Agile."  (Fields-Gomez Decl. ¶ 12.)

Yoh paid its Yoh contractors once a week.  (Yoh 56.1 ¶ 20.)  During the relevant period, if a timecard was not submitted and approved in Acceleration by noon on the Tuesday after a given work week, Yoh could not include that timecard in its weekly payments.  (Yoh 56.1 ¶ 20.) In such instances, Yoh issued payment for the late-submitted timecard in the next pay cycle, after the timecard had been submitted and approved.  (Yoh 56.1 ¶ 20.)  When hours were paid in this "retroactive" manner, the paystub indicated those hours with the notation "RETRO."  (Yoh 56.1 ¶ 21.)

Velazquez often submitted her timecards later than the Tuesday after a given work week, resulting in delayed payments by Yoh.  (CNBC 56.1 ¶ 24.)  Sometimes Velazquez failed to submit her timecards altogether, so Guzman reported Velazquez's hours to Yoh by e-mail based on the daily schedules she maintained.  (*Id.* ¶ 25.)  When Guzman did this, she copied Velazquez on the e-mails, so Velazquez could confirm.  (*Id.*)

Velazquez alleges that, during her time at CNBC, she worked uncompensated overtime, an allegation that Defendants deny.  (Am. Compl. ¶¶ 52–53.)

Velazquez states that she accurately reported all hours worked, but Defendants did not pay her for all of the hours she reported.  (CNBC 56.1 ¶ 75; Pl.'s 56.1 Statement in Resp. to CNBC's 56.1 ("Pl.'s Resp. to CNBC 56.1"), Dkt. No. 121 ¶ 75.)  This allegedly happened for a few reasons.  For example, if Velazquez neglected to enter her time into Agile but had worked impromptu overtime (*i.e.*, hours not reflected in Guzman's daily schedules), Guzman missed this overtime when entering Velazquez's time on her behalf into Agile.  (Pl.'s Mem. of Law in Opp. to Defs.' Mot. for Summ. J. ("Pl.'s Opp."), Dkt. No. 120 at 18.)  Guzman also allegedly manipulated Velazquez's time in Agile in order to stay under budget and to limit Yoh contractors to roughly 20 hours per week, per CNBC policy.  (Pl.'s Opp. at 5–6.)  The record reveals one occasion on which it appears that Guzman may have altered Plaintiff's time to stay under budget for one particular pay period.  (*See* Guzman Decl. ¶¶ 125–30.)

Velazquez alleges that she complained to Guzman in mid-to-late November 2015, among other times, about Defendants' failure to pay her proper wages.  (Am. Compl. ¶ 58; *see also* Pl.'s Opp. at 7–9.)

### 5.  Alleged Discriminatory Comment

Velazquez is a Black Hispanic female, of Dominican origins.  (Am. Compl. ¶ 62.) Guzman was born in the Dominican Republic, and is of Latin American and African American descent.  (CNBC 56.1 ¶¶ 137–38.)

Velazquez alleges that, "early in her employment," Guzman made a statement that "people of [Guzman's] complexion are better off than people of plaintiff's complexion in the Dominican Republic."  (Velazquez Dep. 255:10–256:13.)  Guzman denies ever having made this statement.  (Guzman Decl. ¶ 161.)  It is the only allegedly discriminatory comment that Velazquez identifies.

7

### 6. Velazquez's Persistent Lateness

As Velazquez concedes, it is very important to CNBC's live television operation that its hair and makeup artists be punctual. (CNBC 56.1 ¶ 26; Pl.'s Resp. to CNBC 56.1 ¶ 26.) Persistent lateness constitutes unsatisfactory job performance. (CNBC 56.1 ¶ 27; Pl.'s Resp. to CNBC 56.1 ¶ 27.) CNBC has taken other hair and makeup artists off its schedule because of persistent lateness. (CNBC 56.1 ¶ 28; Dep. of Brenda Guzman ("Guzman Dep."), Ex. 2 to the Puma Decl., Dkt. No. 104-2 at 59:16–60:14;[3] Dep. of Mary Duffy ("Duffy Dep."), Ex. 3 to the Puma Decl., Dkt. No. 104-3 at 43:4–44:19.) Indeed, Guzman testified that she was personally involved in firing one other makeup artist for lateness.

Plaintiff's only response is to object to consideration of this evidence on the grounds that it is hearsay. (Pl.'s Resp. to CNBC 56.1 ¶ 28.) But, of course, Guzman's testimony is not hearsay (an out of court statement offered for the truth of the matter asserted). The witness is reporting what she did; she is not reporting something that was told to her by someone else. Plaintiff also does not cite any evidence that controverts Defendants' statement. Therefore, the paragraph is deemed admitted. *See* Local Rule 56.1(c).

The undisputed facts show that Velazquez was late to work on numerous occasions.

On October 29, 2014, Velazquez was late to both of her scheduled hair and makeup assignments, causing a CNBC contributor to miss his scheduled appearance on the network. (CNBC 56.1 ¶ 30; Pl.'s Resp. to CNBC 56.1 ¶ 30.) Guzman informed Velazquez by e-mail on October 29, 2014 that her lateness was unacceptable; Velazquez replied with an apology. (CNBC 56.1 ¶¶ 31–32; Pl.'s Resp. to CNBC 56.1 ¶¶ 31–32.)

---

[3]    The full transcript of Guzman's deposition is also annexed as Exhibit 4 to the Wotorson Decl. (Dkt. No. 123-4.) The pagination is identical to the excerpts submitted by Defendants; therefore, all references to Guzman's deposition testimony use the citation "Guzman Dep."

Nonetheless, Velazquez arrived late to scheduled assignments after October 29, 2014, giving rise to complaints from CNBC on-air talent and staff. (CNBC 56.1 ¶ 33; Pl.'s Resp. to CNBC 56.1 ¶ 33.)

In July 2015, Duffy and Guzman arranged for NYSE personnel to provide them with electronic badge swipe data for four hair and makeup artists, including Velazquez, so that CNBC could assess the punctuality of these artists' arrival times at that location. (Guzman Decl. ¶ 45; Duffy Decl. ¶ 10; *see also* Pl.'s Resp. to CNBC 56.1 ¶¶ 29, 34.) According to Guzman, the data forwarded by NYSE showed that Velazquez had arrived at NYSE more than five minutes past her call time 35 times in less than two months. (Guzman Decl. ¶ 47.) The same data for the three other makeup artists showed that they had been more than five minutes past their call time on 3, 13, and 18 occasions, respectively. (*Id.*; *see also* Ex. 9 to Guzman Decl. (e-mail from Guzman to Duffy summarizing badge swipe data in response to request).) Plaintiff admits that these other artists' "lateness issues where [*sic*] allegedly not as bad as plaintiff's." (Pl.'s Resp. to CNBC 56.1 ¶¶ 37–39.)

After reviewing the data, Guzman reminded all hair and makeup artists at NYSE who had arrived past their call times, including Velazquez, about the importance of punctuality. (CNBC 56.1 ¶ 40; Pl.'s Resp. to CNBC ¶ 40.) In a separate e-mail to Velazquez, Guzman reminded Velazquez that she was expected to be on time for her assignments, that she must communicate with Guzman if she was running late, and that even being late by five minutes could have a negative impact on CNBC's schedule. (CNBC 56.1 ¶ 41; Pl.'s Resp. to CNBC ¶ 41.) Velazquez responded that she would be on time in the future. (CNBC 56.1 ¶ 42; Pl.'s Resp. to CNBC ¶ 42.)

Nonetheless, Velazquez continued to arrive late for her assigned shift multiple times between July and September of 2015.  (CNBC 56.1 ¶ 44 (citing, in part, Velazquez Dep. 176:2–178:15 (admitting she was late "more than once" during this period)).)[4]

According to Defendants, on or about September 14, 2015, at DeAngelis's request, Guzman again spoke with Velazquez about her recurring lateness at NYMEX.  (CNBC 56.1 ¶ 45.)

On September 22, 2015, Velazquez arrived at NYMEX 20 minutes past her call time. (Ex. 3 to the DeAngelis Decl.)

On November 18, 2015, a CNBC reporter who worked at NYSE, Kayla Tausche told Duffy and Guzman that Velazquez "usually" arrived to the NYSE to do her hair and makeup at 10:30.  (CNBC 56.1 ¶ 47.)  That evening, Duffy e-mailed Velazquez, asking, "What time do you arrive at the NYSE each day?"  Velazquez responded, "10:15 – 10:20."  (Ex. 6 to Duffy Decl.)

In an attempt to accommodate Velazquez's recurring lateness to NYSE, Duffy moved Velazquez's usual call time at NYSE from 10:00 a.m. to 10:30 a.m.  (CNBC 56.1 ¶ 48; Pl.'s Resp. to CNBC ¶ 48.)  But, on January 13, 2016, Guzman, who was onsite at NYSE, saw Velazquez arrive late for her 10:30 call time.  (Guzman Decl. ¶ 58.)

---

[4]     Plaintiff tries to raise a genuine issue of material fact as to her lateness by saying that other makeup artists were late. (Pl.'s Resp. to CNBC 56.1 ¶¶ 44–46, 49–57 (citing Guzman Dep. at 57–58).)  No one disagrees that other makeup artists were also late, even late 18 times (albeit still on fewer occasions than Plaintiff was). (*See* Guzman Dep. 57:1–58:25.).  Plaintiff was not even the only makeup artist who was *fired* for being late. The facts in these paragraphs are deemed admitted. *See Hill v. Bloomberg L.P.*, No. 14-cv-9809, 2016 WL 1665599, at *2 (S.D.N.Y. Apr. 20, 2016) ("I will . . . deem admitted any factual assertions made by Bloomberg that is supported by competent evidence in the record, and that is not disputed by competent, admissible, testimonial facts (as opposed to conclusory assertions or argument) in Hill's affidavit.").

### 7. Velazquez's De-Scheduling[5]

On January 28, 2016, Velazquez sent a series of text messages to DeAngelis, past her 8:30 call time, the last of which read "here paying the cab" at 8:47 a.m. (Ex. 5 to DeAngelis Decl.)

The next day, Velazquez was scheduled to work an 8:30 a.m. to 9:30 a.m. shift at NYMEX to handle DeAngelis's hair and makeup. (CNBC 56.1 ¶ 52.)

According to Defendants, at 8:20 that morning, Velazquez told Guzman by phone that she had overslept and had not yet left for the NYMEX. (Guzman Decl. ¶ 61.) Guzman then e-mailed DeAngelis to let her know that she would have to do her own hair and makeup. (DeAngelis Decl. ¶ 20.)

DeAngelis and Velazquez then spoke by phone, and Velazquez purportedly told DeAngelis she had overslept. (DeAngelis Decl. ¶ 22.)

Thereafter, DeAngelis asked Guzman not to book Velazquez for her anymore "if possible" and wrote this was "the second time [Velazquez] hasn't shown up for me and she's chronically late when she does come." (Ex. 6 to DeAngelis Decl.)

Guzman informed Velazquez later that day that she had made a decision to take her off the schedule. (CNBC 56.1 ¶ 58; Pl.'s Resp. to CNBC ¶ 58.)

Plaintiff initially expressed contrition. That evening, Velazquez sent a text message to DeAngelis apologizing for the events of that morning. (Ex. 7 to DeAngelis Decl.) The following day, Velazquez also sent an e-mail to Duffy, DeAngelis, and Guzman, in which she apologized "for any upset and disappointment [she] caused" during her time as a hair and makeup artist for CNBC. (CNBC 56.1 ¶ 60; Pl.'s Resp. to CNBC ¶ 60.)

---

[5]      "De-scheduling" means termination in CBNC-speak.

In her Amended Complaint, however, Velazquez alleged that her de-scheduling for lateness was pretextual, and that she was actually de-scheduled both in retaliation for her wage and hour complaints, and because of race, color, and national origin discrimination. (Am. Compl. ¶¶ 80, 98, 111.)

### B. Procedural History

In the spring or summer of 2016, Velazquez retained an attorney, Rudy A. Dermesropian, Esq. (*See* Dkt. No. 59 at 2; CNBC 56.1 ¶ 66.) She filed this action as both a putative FLSA class action and an individual action in February 2017, and Defendants answered in April 2017. (*See* Compl., Dkt. No. 1; Answer, Dkt. Nos. 22–25.)

On the day Plaintiff's motion for conditional certification was due, the Parties reached a settlement in principle. (*See* Dkt. No. 59 at 2.) Approximately a week later, Plaintiff thought better of it, fired Mr. Dermesropian, and retained Ambrose Wotorson, Esq. (*See id.* at 3; *see also* Dkt. No. 60.)

Plaintiff's new counsel informed Defendants that Plaintiff would not abide by the settlement. (*See* Dkt. No. 59 at 3.) Defendants filed a motion to enforce the agreement in principle, but the Court denied that motion, finding the settlement agreement unenforceable under both New York and federal law. (*See id.* at 4–5.)

In October 2017, the Court granted Plaintiff's motion for leave to file an amended Complaint by October 25, which would "excise the class allegations." (Dkt. No. 60 at 1.) Plaintiff's counsel missed this deadline, the beginning of a pattern of missing deadlines.

On October 27, 2017, Plaintiff's counsel missed the deadline to produce documents or respond to Defendants' written discovery requests. (*See* Dkt. No. 73 at 1.) At a hearing on November 20, 2017, Magistrate Judge Barbara Moses ordered Plaintiff to serve complete

responses to Defendants' interrogatories by the following day, and to produce all documents responsive to Defendants' document requests within one week, "on pain of sanctions." (Dkt. No. 67 at ¶¶ 1–2.) Plaintiff subsequently missed this document production deadline, although sanctions (apparently) never issued. (*See* Dkt. No. 73 at 2.)

In her first deposition on December 8, 2017, Plaintiff testified that she began annotating copies of her pay stubs starting in June 2015, to reflect the hours she purportedly worked without receiving pay. (*See id.*) Defendants, to whom only *un*-annotated pay stubs had been produced in discovery, demanded production of the annotated pay stubs within 72 hours. (*Id.*) Plaintiff's counsel failed to comply. (*Id.*)

In response, Defendants filed a letter motion for a discovery conference before Magistrate Judge Moses, (Dkt. No. 73), which was set for December 28, 2017, (Dkt. No. 74). Plaintiff's counsel filed his response one day after the court-ordered deadline. (Dkt. No. 78.)

On January 5, 2018, Plaintiff filed a letter motion with this Court seeking leave to file an amended Complaint, (Dkt. No. 84), which the Court granted. (*See* Minute Entry on 1/12/2018.) The Court subsequently extended discovery through the end of April 2018, and ordered that the Parties file their Proposed Joint Pretrial Order by July 13, 2018. (Dkt. No. 86.)

Plaintiff eventually filed her Amended Complaint on April 10, 2018. (Dkt. No. 87.) The Amended Complaint dropped the FLSA class claims, but included a new cause of action for national origin discrimination, which had not been mentioned in Plaintiff's original letter motion seeking leave to file an amended complaint. (*See* Dkt. No. 84.)

Defendants answered the Amended Complaint on April 24, (Dkt. Nos. 93–96), and filed this motion for summary judgment on June 15, 2018 (Dkt. No. 97).

Thereafter, Plaintiff's counsel failed to file his portions of the pretrial order or responsive papers on time. (*See* Dkt. Nos. 107, 113, 116–17.)

When Plaintiff's counsel eventually filed the opposition papers, they admitted the overwhelming majority of facts in Defendants' 56.1 statements and referenced absolutely no record evidence, other than three deposition transcripts. (Dkt. Nos. 120–24.)

## II.    Standard of Review

A party is entitled to summary judgment when there is no "genuine dispute as to any material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

Whether a disputed issue of fact exists is for the Court to determine. *Balderman v. U.S. Veterans Admin.*, 870 F.2d 57, 60 (2d Cir. 1989). The moving party has the initial burden of demonstrating the absence of a disputed issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 322–23 (1986).

Once the motion for summary judgment is properly made, the burden shifts to the non-moving party, which "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250. The nonmovant "may not rely on conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998), but must support the existence of an alleged dispute with specific citation to the record materials. *See* Fed. R. Civ. P. 56(c)(1).

While the Court must view the record "in the light most favorable to the nonmoving party," *Leberman v. John Blair & Co.*, 880 F.2d 1555, 1559 (2d Cir. 1989) (citations omitted), and "resolve all ambiguities and draw all reasonable inferences in favor of the party against whom summary judgment is sought," *Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317,

1320 (2d Cir. 1975) (citations omitted), the non-moving party nevertheless "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citations omitted). Not every disputed factual issue is material in light of the substantive law that governs the case. *Anderson*, 477 U.S. at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*

### III.   The Court Grants Defendants' Motion for Summary Judgment on Velazquez's Overtime and Retaliation Claims Under the FLSA and NYLL (Counts One and Two)

#### A.   Overtime Claims Under the FLSA and NYLL

Counts One and Two of the Amended Complaint assert, in part, that Plaintiff is entitled to overtime wages pursuant to the FLSA and NYLL, respectively. (Am. Compl. ¶¶ 88–114.)[6] As part of these claims, Plaintiff alleges that she is owed for overtime she allegedly worked but which was not included in her time sheets, so-called "off-the-clock" claims.

As part of Counts One and Two, she also asserts claims for retaliation, which are discussed in the next section.[7]

#### 1.   Legal Standard

"To establish liability under the FLSA on a claim for unpaid overtime, a plaintiff must prove that he performed work for which he was not properly compensated, and that the employer had actual or constructive knowledge of that work." *Kuebel v. Black & Decker Inc.*, 643 F.3d

---

[6]   Counts One and Two discuss violations of overtime <u>only</u>. (*See* Am. Compl. ¶¶ 88–114.) Plaintiff's opposition brief also references only overtime wages. (*See, e.g.*, Pl.'s Opp. 1, 15–18.) However, the Court observes that the Amended Complaint contains a factual allegation that Plaintiff worked some standard hours for which she was not compensated. (*See* Am. Compl. ¶ 52.) The Court does not consider this to constitute part of Plaintiff's claims for relief. *See Agerbrink v. Model Serv. LLC*, No. 14-cv-7841, 2015 WL 3750674, at *7 (S.D.N.Y. June 16, 2015) (distinguishing factual allegations from claims in a complaint).

[7]   These claims, of course, should have been listed as separate counts in the Amended Complaint.

352, 361 (2d Cir. 2011) (citing *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686–87 (1946)).

At summary judgment, a plaintiff must support his burden by first "'produc[ing] sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference.'" *Kuebel*, 643 F.3d at 361 (quoting *Anderson*, 328 U.S. at 687). "'[W]hen the employer has kept proper and accurate records, the employee may easily discharge his burden by securing the production of those records.'" *Id.* at 362 (quoting *Anderson*, 328 U.S. at 687). However, if an employer's records are inaccurate or inadequate, "It is well settled . . . that it is possible for a plaintiff to meet this burden through estimates based on [her] own recollection." *Id.* This burden is "not onerous." *Id.* at 364; *see also Nicholsen v. Feeding Tree Style, Inc.*, No. 12-cv-6236, 2014 WL 476355, at *3 (S.D.N.Y. Feb. 6, 2014) (If an employer fails to keep accurate records in contravention of 29 U.S.C. § 211(c), "the Supreme Court has held that the employer, not the employee, should bear the resulting burden in a FLSA suit.") (citing *Anderson*, 328 U.S. at 686–87).

Once a plaintiff meets her evidentiary burden, "'The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence.'" *Kuebel*, 643 F.3d at 364 (quoting *Anderson*, 328 U.S. at 687–88).

A similar burden-shifting standard applies to unpaid compensation claims under the NYLL. *Gamero v. Koodo Sushi Corp.*, 272 F. Supp. 3d 481, 498 (S.D.N.Y. 2017), *aff'd*, No. 17-cv-3356, 2018 WL 5098817 (2d Cir. Oct. 18, 2018). However, "under the NYLL, an employer who fails to keep accurate records shoulders a more stringent burden of proof." *Id.* Pursuant to NYLL § 196-a(a), an employer may not "discharge this burden by undermining the

reasonableness of an employee's evidence that he was underpaid." *Id.* Instead, it must

affirmatively demonstrate that it in fact fully compensated its employees. *Id.*

### 2. For Purposes of this Motion Only, The Court Will Apply the Relaxed Evidentiary Burden Under *Anderson*

The first issue for decision is whether CNBC and/or Yoh violated its duty to keep

accurate records, so as to trigger *Anderson*'s more lenient burden of proof.

Plaintiff contends that her timecards are inaccurate for multiple reasons: (i) before

Velazquez was on-boarded as a Yoh contractor, Fields-Gomez simply submitted invoices on her

behalf; (ii) after Velazquez was on-boarded, Guzman would verify Plaintiff's hours in Agile

"solely by checking them against the work schedules," which did not capture impromptu

overtime; (iii) when Plaintiff failed to fill out her timecard, Guzman would estimate her hours

based only on the daily work schedules; and (iv) Guzman would often manipulate Plaintiff's

hours in Agile to be just shy of 40 hours, for budgetary and staffing reasons. (Pl.'s Opp. at 4–7;

Pl.'s Resp. to CNBC 56.1 ¶¶ 76–132.)

It is highly questionable whether Plaintiff is entitled to *Anderson* burden-shifting.

Defendants have offered records showing that, for the weeks identified in Plaintiff's Amended

Complaint, (Am. Compl. ¶¶ 52–53), she was compensated for all standard and overtime hours

worked. (*See* Guzman Decl. ¶¶ 70–150 (attesting that Guzman compared Velazquez's

allegations to her daily schedules, copies of Velazquez's Agile timecards, and Velazquez's pay

stubs as produced by Yoh); *see also* CNBC 56.1 ¶¶ 76–132.) The evidence also establishes that,

for some of these weeks, Defendants paid Velazquez statutory overtime. (*See, e.g.*, Guzman

Decl. ¶ 102 (records show Velazquez was paid 6.5 hours of overtime for the week of May 17,

2015); *id.* ¶ 130 (records show Velazquez was paid 13.67 hours of overtime for the week of

August 23, 2015, through an invoice dated September 15, 2015).)  Defendants argue that Plaintiff has offered no evidence that any of these records is inaccurate. (Defs.' Br. at 17.)

Nonetheless, keeping in mind that the Court must draw every inference in favor of the Plaintiff, we will bend over backwards and assume *arguendo* that she has met her burden to show inaccurate recordkeeping, and therefore that she is entitled to *Anderson* burden-shifting.

### 3.   Plaintiff Fails to Introduce Any Evidence of Uncompensated Work

Under the *Anderson* burden-shifting analysis, Plaintiff still loses at summary judgment, because she introduces no competent evidence that she performed as much as one hour of uncompensated overtime work.

Under the *Anderson* framework, "the plaintiff may carry out [his] burden 'if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference.'" *Moon v. Kwon*, 248 F. Supp. 2d 201, 219 (S.D.N.Y. 2002) (quoting *Anderson*, 328 U.S. at 687).  In the motion to dismiss context—where the standard is mere plausibility—the Second Circuit has held that "in order to state a plausible FLSA overtime claim, a plaintiff must sufficiently allege 40 hours of work *in a given workweek* as well as some uncompensated time in excess of the 40 hours." *Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 114 (2d Cir. 2013) (emphasis added).  On a motion for summary judgment, therefore, a plaintiff must at the bare minimum identify specific weeks in which she worked overtime for which she was not paid.

The Court finds that Defendants are entitled to summary judgment, because Plaintiff has not pointed to a single workweek in which she worked uncompensated time in excess of 40 hours.

Plaintiff offers a convoluted theory: she claims that she "accumulated" unpaid overtime hours (as well as unpaid standard hours) during unspecified weeks, which then mysteriously "accrued" or "came due" on the dates listed in her interrogatory responses. The Court initially had great difficulty understanding exactly what Plaintiff was arguing, and struggled to decipher what she offers by way of testimonial proof. Defendants had the same difficulty, as they explain in their reply papers. (*See* Defs.' Reply Mem. of Law in Supp. of Mot. for Summ. J., Dkt. No. 132 at 8.)

Initially, Plaintiff did not identify *any* specific week in which she had worked unpaid overtime. (CNBC 56.1 ¶ 67.) During discovery, CNBC timely served an interrogatory on Plaintiff seeking, "for each workweek . . . in which Plaintiff alleges [she] was not compensated . . . for all hours allegedly worked," to have Plaintiff "(a) identify each such workweek by the date of the first day of the workweek, [and] (b) state the total amount of hours allegedly worked *during each day of such week*[.]" (Ex. 3 to the Decl. of Erik Bierbauer in Supp. of Reply Mem. of Law dated Aug. 24, 2018, Dkt. No. 135 at 6–7 (emphasis added).) Velazquez failed to identify any specific workweeks in either her first interrogatory response or in a subsequent, amended interrogatory response. (CNBC 56.1 ¶¶ 68–69.)

Plaintiff's third and final interrogatory response—which she was ordered to serve on pain of sanctions—read, in relevant part:

> Defendants owe plaintiff compensation, including overtime for the following dates:
>
> *a.*    **Owed Hours**
>
> [ . . . ]
>
> *3/15/2015       1.5 hrs plus 1 hr ot*
>
> [ . . . ]

| | |
|---|---|
| *5/31/2015* | *2 hrs plus 1.5 hrs overtime* |

b.      *Overtime*

| | |
|---|---|
| *1/03/2016* | *12.5 hours* |
| *5/31/2015* | *1.5 hours* |
| *7/19/2015* | *31 hrs* |
| *9/06/2015* | *12.5 hrs* |
| *6/21/2015* | *32 hrs* |
| *4/26/2015* | *35 hrs* |
| *5/24/2015* | *6.5 hrs* |

(Ex. 7 to Puma Decl. at 4–6.)

At her deposition, Defendants asked Plaintiff to reconcile these numbers with Defendants' evidence, which included Plaintiff's own timecards from Agile, Guzman's daily schedules, and Plaintiff's pay stubs, corresponding to the weeks listed. Plaintiff could not do so. She testified that these numbers actually represented unpaid overtime hours that she "accumulated" during other, unspecified weeks. (*See* Velazquez Dep. 112:1–6 ("Q: Are you alleging that in each of these listed weeks you were shorted this many hours of overtime pay? A: So the hours here, overtime pay, are throughout my weeks that I worked, that on these dates were due.").)

For example, Plaintiff's interrogatory response listed 31 hours of overtime corresponding to July 19, 2015. Plaintiff testified this meant that she "was owed 31 hours on that pay period of overtime." (*Id.* 121:21–22.) However, she could not explain what constituted a "pay period," since Yoh contractors are paid weekly. Nor could she offer any explanation why overtime hours would have "accrued" on the specific dates listed, which did not correspond to the end of the month or the quarter. (*See, e.g., id.* 121:23–122:5 ("Q: On that pay period, meaning the week of

July 19, 2015?  A:  No, not the week.  Accumulating to that week.  So whatever happened

between this week's—this pay period—you guys have the records.  I mean, you guys have this

information.").)

When pressed at her second deposition, Velazquez also could not say whether the hours

listed represented standard or overtime hours.  (*Id.* 428:14–18 ("Q:  And you can't say whether

that was two hours of regular time or overtime?  A:  I can't testify to that.  I don't remember.").)

Velazquez was also unable to match the annotations on her pay stubs to particular workweeks.

(*Id.* 428:19–22 ("Q:  And do you know if [a notation of two hours] referred to the pay period on

that pay stub on page 1807 and 1808, or a different pay period?  A:  I— I can't.").)

In addition to retreating from her interrogatory responses, Velazquez lied about using

contemporaneous notes to estimate this unpaid overtime.  At the first session of her deposition on

December 8, 2017, Velazquez testified that she derived her overtime estimates by comparing her

pay stubs to schedules contemporaneously circulated by Guzman, as well as using her own

memory.  (CNBC 56.1 ¶ 71; Velazquez Dep. 91:15–92:5; 94:19–95:21.)  She further testified

that she made handwritten notes regarding her allegedly uncompensated hours on her pay stubs

in June 2015.  (Velazquez Dep. 92:6–21; 117:3–23 ("I took notes in June of 2015 when I started

noticing, like, hey, I'm being short of pay, let me look into the other weeks.").)  This turned out

to be false.  At the second session of her deposition on January 5, 2018, Velazquez admitted that

she had not made handwritten notes on her paystubs until after she retained an attorney in 2016.

(CNBC 56.1 ¶ 73; Velazquez Dep. 407:3–409:19.)

The upshot is that, in opposing this motion, Velazquez has not identified a single week in

which she worked more than 40 hours and was not paid for overtime.  (*See, e.g., id.* 145:23–147:4

(admitting that she "can't identify any week leading up to t[he] week of April 26, 2015, when

[she] worked more than 40 hours").)  Furthermore, Plaintiff does not offer any evidence of what tasks she was doing that caused her to work the supposed unpaid overtime, or at which of CNBC's broadcasting locations she earned it.

In light of Plaintiff's failure to introduce any evidence that would allow a finder of fact to determine that she performed uncompensated overtime, there is no occasion to consider whether Defendants have discharged their burden to rebut this evidence.

The Court therefore grants summary judgment to Defendants dismissing Plaintiff's overtime claims under the FLSA and NYLL.

### B.    Retaliation Claims Under the FLSA and NYLL

Counts One and Two also assert, in part, retaliation claims against all Defendants under the FLSA, 29 U.S.C. § 215(a)(3), and the NYLL, N.Y. Lab. L. § 215(1)(a), based on complaints Velazquez made about her pay to Guzman in mid-to-late November of 2015.  (Am. Compl. ¶¶ 58, 98, 111; *see also* Pl.'s Opp. at 10.)

#### 1. Legal Standard

The FLSA provides that it is unlawful "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee."  29 U.S.C. § 215(a)(3).

Similarly, the NYLL renders it unlawful to "discharge, threaten, penalize, or in any other manner discriminate or retaliate against any employee," because, among other things, "such employee has made a complaint to his or her employer" or "has otherwise exercised rights protected under this chapter."  N.Y. Lab. L. § 215(1)(a).

Retaliation claims under the FLSA and NYLL "are subject to the three-step burden-shifting framework established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Mullins v. City of New York*, 626 F.3d 47, 53 (2d Cir. 2010); *see also Esmilla v. Cosmopolitan Club*, 936 F. Supp. 2d 229, 239 n.7 (S.D.N.Y. 2013). To make out a prima facie case for retaliation, a plaintiff must provide evidence of: "'(1) participation in protected activity known to the defendant, like the filing of a FLSA lawsuit; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action.'" *Cabrera v. CBS Corp.*, No. 17-cv-6011, 2018 WL 1225260, at *3 (S.D.N.Y. Feb. 26, 2018) (quoting *Mullins*, 626 F.3d at 53 (2d Cir. 2010)).

"Once the plaintiff establishes a prima facie case of FLSA retaliation, the burden shifts to the defendant to articulate a 'legitimate, non-discriminatory reason for the employment action.'" *Mullins*, 626 F.3d at 53 (quoting *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000)).

### 2. Plaintiff Fails to Provide Any Evidence of an Oral Complaint That Could Constitute Protected Activity

On summary judgment, Plaintiff argues that she complained orally to Guzman, Fields-Gomez, and Duffy about not being paid overtime and about the practice of "carrying over" her hours. (Velazquez Dep. 152:23–153:16; 258:12–259:18; 329:11–24; 335:9–23.)

In *Greathouse v. JHS Sec. Inc.*, 784 F.3d 105 (2d Cir. 2015), the Court of Appeals held that oral complaints could qualify as a "protected activity" for purposes of a retaliation claim under Section 215(a)(3) when they are "made to employers in a context that makes the assertion of rights plain." *Id.* at 115. An oral complaint is protected activity "'when a reasonable, objective person would have understood the employee to have put the employer on notice that the employee is asserting statutory rights under the Act.'" *Id.* at 116 (citing *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 14 (2011)).

While some courts in this circuit require that the oral complaint "be framed in terms of potential illegality," *Dunn v. Sederakis*, 143 F. Supp. 3d 102, 112 (S.D.N.Y. 2015), other courts hold that an explicit claim of illegality is not necessary, although the plaintiff must make a "clear articulation of facts indicative of illegality," *Lopez v. Advantage Plumbing & Mech. Corp.*, No. 15-cv-4507, 2016 WL 1268274, at *2 (S.D.N.Y. Mar. 30, 2016) (quoting *Dunn*, 143 F. Supp. 3d at 113). In either case, "A 'grumble in the hallway,' . . . or a 'mere passing comment' does not suffice." *Cabrera*, 2018 WL 1225260, at *3 (citing *Greathouse*, 784 F.3d at 116).

Under either standard, Plaintiff has not offered any evidence that any oral complaints she made during the course of her employment constituted protected activity.

First, Velazquez says she complained to Fields-Gomez about "her money." (Velazquez Dep. 258:15.) This vague comment clearly does not meet the *Greathouse* standard, since it fails either to mention any right protected by the federal or state labor laws, or to make a "clear articulation of facts indicative of illegality." *Dunn*, 143 F. Supp. 3d at 113.

Second, Velazquez told Fields-Gomez that "it almost feels to me that this company is just being racist" because she was not paid time-and-a-half on Martin Luther King, Jr. Day. (*Id.* 258:16–259:9.) However, Velazquez herself admitted that she did not work more than 40 hours during the week that included Martin Luther King, Jr. Day. (*Id.*) The law does not require that work performed on a federal (not a CNBC) holiday be compensated at time and a half rates.

Third, Velazquez "question[ed]" Fields-Gomez "about inputting time and hours missing." (*Id.* 329:11–24.) She later contradicted this testimony, stating that she did not "ever have any conversations with [Fields-Gomez] about Brenda Guzman moving hours." (*Id.* 333:17–21.) Even if her testimony were consistent, however, "Asking how wages are being calculated, or informing management of 'questions and concerns,' is not the same thing as

complaining of a particular, perceived violation of law." *Robledo v. No. 9 Parfume Leasehold*, No. 12-cv-3579, 2013 WL 1718917, at *9 (S.D.N.Y. Apr. 9, 2013).

Fourth, Velazquez had a conversation with Guzman in November 2015, which consisted of the statements, "Where is my money?"; "You guys do this s*** often. I'm tired of it."; and "I better get paid in the next week." (Velazquez Dep. 153:2–16.) Velazquez also sent a text to Guzman at some point "asking her if she had been to my Yoh account again to fix my hours because I was short on money." (*Id.* 61:15–18.) As with the first comment discussed above, these comments articulate no right protected by the federal or state labor laws, and are not reasonably susceptible of being interpreted as an invocation of her rights under such laws.

Finally, Velazquez testified that she "was already letting [Guzman] know that there [were] tons of discrepancies prior to [her], really, like, initial complaint." (*Id.* 59:23–60:2.) In addition to being vague, this evidence at most shows that Velazquez was dissatisfied with Guzman's failure to honor the terms of their "agreement" to "get paid" for certain hours "on a different week in a different paycheck" (Velazquez Dep. 349:19–24), and that Plaintiff was growing impatient.

In sum, none of the above comments would have provided any Defendant "with a basis . . . to infer that she was claiming an FLSA or NYLL violation, as opposed to expressing that she did not understand her overtime pay or flagging a potential clerical error," *Watkins v. First Student, Inc.*, No. 17-cv-1519, 2018 WL 1135480, at *10 (S.D.N.Y. Feb. 28, 2018), and would not have put any Defendant on notice that Plaintiff was asserting her statutory rights to overtime pay under the FLSA. *See Caddick v. Pers. Co. I LLC*, No. 16-cv-7326, 2018 WL 3222520, at *9 (S.D.N.Y. June 29, 2018) (dismissing claim where complaints could "hardly be distinguished

from a complaint about Defendants' failure to follow internal policy"). Therefore, summary judgment is appropriate on Plaintiff's retaliation claim.

### 3. Plaintiff Has Failed to Offer Evidence That Her De-Scheduling Was Pretextual

Nonetheless, even if Plaintiff had met her prima facie burden to show that she engaged in protected activity, Defendants would still be entitled to summary judgment, because CNBC had a perfectly valid reason to fire her, and Velazquez has failed to offer any evidence that Defendants' claimed reason for firing her—her habitual tardiness—was a pretext for retaliation. (CNBC 56.1 ¶¶ 26–64.)

None of the critical facts is in dispute. Plaintiff has admitted that a hair and makeup artist's persistent lateness constitutes unsatisfactory job performance. (Pl.'s Resp. to CNBC 56.1 ¶ 27.) She has also admitted that she was repeatedly warned about her lateness and that she acknowledged receiving these warnings. (Pl.'s Resp. to CNBC 56.1 ¶¶ 31–32, 40–42.) Plaintiff has in fact *stipulated* to most of the material facts regarding her lateness, including the incident on October 29, 2014 that caused talent to miss an on-air appearance; and the fact that Duffy adjusted her call time in November 2015 to accommodate her repeated late arrivals to the NYSE—to no avail. (*Id.* ¶¶ 30, 48.)

Velazquez does not offer any competent, admissible evidence contradicting Defendants' evidence about her late arrival on September 22, 2015, or the 35 times she arrived late to her NYSE shift. (*Id.* ¶¶ 37, 46.) Nor does Plaintiff offer any evidence that contradicts Defendants' description of the events of January 28, 2016 and January 29, 2016, which led to her termination. (*Id.* ¶¶ 51–55.)

The following facts are also deemed admitted: during Velazquez's assignment to CNBC, no other hair and makeup artist had chronic lateness issues as severe as hers (*id.* ¶ 62), or was the

26

subject of a request by talent that Guzman no longer schedule the artist to handle his/her hair and makeup (*id.* ¶ 63).

Plaintiff's 56.1 response contains nothing but (i) a blanket denial of these facts—which, as her counsel well knows, does not defeat a motion for summary judgment that is supported by evidence—and (ii) irrelevant testimony. For instance, even accepting as true that Velazquez sometimes worked past her daily shift at the NYMEX because another artist was late relieving her (Velazquez Dep. 104:19–105:16), Defendants de-scheduled Velazquez because she routinely failed to arrive on time for her *8:30 a.m. shift*—something on which the other artist's lateness had no bearing. And, as mentioned earlier, Defendants do not dispute that other artists were sometimes late. (CNBC 56.1 ¶¶ 28, 38, 40.) Plaintiff, for her part, does not disagree that at least one other makeup artist was fired, as she was, for chronic lateness. (Pl.'s Resp. to CNBC 56.1 ¶ 28.)

Plaintiff does not offer an iota of evidence that firing her for lateness was pretextual. Accordingly, the Court grants summary judgment to Defendants dismissing Velazquez's FLSA and NYLL retaliation claims.

## IV.   The Court Grants Defendants' Motion for Summary Judgment on Velazquez's Recordkeeping Claim Under the NYLL (Count Three)

Count Three of Plaintiff's Amended Complaint alleges that Defendants "failed to make, keep, and preserve accurate records with respect to Plaintiff, including, but not limited to, hours worked each workday and total hours worked each work week, as required by NYLL Art. 19 *et seq.*" (Am. Compl. ¶ 116.)

Defendants argue that Plaintiff's recordkeeping claim should be dismissed because "courts have repeatedly held that there is no private right of action for a recordkeeping claim under the NYLL." (Defs. Br. at 20.)

27

Plaintiff does not oppose this part of Defendants' motion. And for good reason: Defendants are correct. Subsection 195(4) of the New York Labor Law requires employers to "establish, maintain and preserve . . . contemporaneous, true, and accurate payroll records" reflecting "for each week worked the hours worked; the rate or rates of pay and basis thereof." In contrast to subsections (1) and (3) of the same section, however, subsection (4) does not have a corresponding express private right of action, *see* N.Y. Lab. L. § 198(1-b)–(1-d), and courts have not implied one. *See Mumin v. Uber Techs., Inc.*, 239 F. Supp. 3d 507, 535 (E.D.N.Y. 2017), *reconsideration denied sub nom. Ortega v. Uber Techs. Inc.*, No. 15-cv-7387, 2017 WL 1737636 (E.D.N.Y. May 2, 2017); *Carter v. Tuttnaeur U.S.A. Co., Ltd.*, 78 F. Supp. 3d 564, 571 (E.D.N.Y. 2015); *In re Domino's Pizza Inc.*, No. 16-cv-6274, 2018 WL 1587593, at *7 (S.D.N.Y. Mar. 27, 2018).

The Court therefore grants summary judgment to Defendants dismissing Count Three of Plaintiff's Amended Complaint.

## V. The Court Grants Defendants' Motion for Summary Judgment on Velazquez's Itemized Wage Statement Claim Under the NYLL (Count Four)

Count Four of Plaintiff's Amended Complaint alleges that Defendants "knowingly and intentionally failed to provide timely, accurate, and complete itemized wage statements." (Am. Compl. ¶ 121.) Defendants argue in their motion papers that, "Discovery has not substantiated these allegations." (Defs. Br. at 20.)

Plaintiff does not even bother to respond. This claim is therefore deemed abandoned, and Defendants' motion for summary judgment dismissing Count Four for a complete failure of proof is granted.

**VI.    The Court Grants Defendants' Motion for Summary Judgment on Velazquez's Federal, State, and Municipal Discrimination Claims (Counts Five to Ten)**

Velazquez asserts claims under the NYSHRL for race discrimination (Count Five), color discrimination (Count Seven), and national origin discrimination (Count Eight); under 42 U.S.C. § 1981 for race and color discrimination (Count Six); and under the NYCHRL for race discrimination (Count Nine), and color discrimination (Count Ten). (Am. Compl. ¶¶ 124–53.) Velazquez's six discrimination claims under federal, state, and city law are identical, and are asserted against all of the Defendants.

Defendants move for summary judgment on all of Velazquez's discrimination claims, arguing that Velazquez (i) fails to establish a prima facie case, and (ii) CNBC has offered legitimate, non-discriminatory reasons for ending her assignment. (Defs. Br. at 6.)

Surprisingly, Velazquez devotes no part of her opposition papers to answering any of Defendants' arguments raised against her discrimination claims. (*See generally* Pl.'s Opp.) Indeed, her opposition brief does not address her discrimination claims at all, apart from including—in a section of the brief labeled "Statement of Facts That Are in Dispute"—an argument that Guzman made a statement "early in [Velazquez's] employment" that "people of [Guzman's] complexion are better off than people of plaintiff's complexion in the Dominican Republic." (Pl.'s Opp. at 4.) Guzman denies making this statement. (Guzman Decl. ¶ 161.)

Again, I can only conclude that Plaintiff has abandoned her discrimination claims. That is a sensible decision on her part, because there is absolutely no evidence that any Defendant took any adverse action against Plaintiff that was motivated—in whole or in part—by discrimination of any sort.

### A.   Race, Color, and National Origin Discrimination Claims Under Section 1981 and the NYSHRL (Counts Five to Eight)

Velazquez's claims under Section 1981 and the NYSHRL are "governed by the same liability standard and analytical framework as Title VII disparate treatment claims," *i.e.*, the *McDonnell Douglas* burden-shifting framework. *Hill v. City of New York*, 136 F. Supp. 3d 304, 331 (E.D.N.Y. 2015); *accord Weinstock*, 224 F.3d at 42 n.1.

Velazquez's NYCHRL claims are analyzed separately, as Defendants shoulder a slightly higher burden. *Hill*, 136 F. Supp. 3d at 331

#### 1.   Legal Standard

Under the Title VII burden-shifting framework, "a plaintiff initially bears the burden of producing evidence to support a prima facie case of discrimination by showing that: (1) the plaintiff is a member of a protected class; (2) the plaintiff was qualified for her position, or was performing her job duties satisfactorily; (3) the plaintiff suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances that give rise to an inference of discrimination." *Davis-Bell v. Columbia Univ.*, 851 F. Supp. 2d 650, 669 (S.D.N.Y. 2012) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).

"While such evidence need be no more than 'minimal' or 'de minimis,' a plaintiff's claims nevertheless fail if she cannot make out her prima facie case." *Id.* at 669–70 (internal quotations omitted).

#### 2.   Plaintiff Fails to Offer Prima Facie Evidence of Race, Color, or National Origin Discrimination

"The Second Circuit has found that circumstances contributing to a permissible inference of discriminatory intent in an employment discrimination action may include the employer's continuing, after the employee's discharge, to seek applicants from persons of employee's qualifications to fill that position, an employer's criticism of plaintiff's performance in ethnically

degrading terms, an employer's invidious comments about others in employee's protected group, employer's more favorable treatment of employees not in plaintiff's protected group, the sequence of events leading to the employee's discharge or the timing of the discharge." *Jamieson v. Poughkeepsie City Sch. Dist.*, 195 F. Supp. 2d 457, 468 (S.D.N.Y. 2002) (citing *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37–38 (2d Cir. 1994)). On summary judgment, a district court must determine "'whether the proffered admissible evidence shows circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive.'" *Davis-Bell*, 851 F. Supp. 2d at 670 (quoting *Bryant v. Verizon Commc'ns, Inc.*, 550 F. Supp. 2d 513, 534 (S.D.N.Y. 2008)). A plaintiff's deposition testimony may be insufficient to defeat a motion for summary judgment where the testimony recounts remarks that are either "unsupported by admissible evidence or benign." *See Olle v. Columbia Univ.*, 332 F. Supp. 2d 599, 612 (S.D.N.Y. 2004), *aff'd*, 136 F. App'x 383 (2d Cir. 2005).

As evidence of discriminatory intent, Plaintiff points only to a statement allegedly made by Guzman, "early in [Velazquez's] employment," that "people of [Guzman's] complexion are better off than people of plaintiff's complexion in the Dominican Republic." (Pl.'s Opp. at 4; *see also* Velazquez Dep. at 255:10–256:4.) I will assume, for purposes of this motion, that the statement was made.

But it does not matter, because no rational finder of fact could infer discriminatory intent undergirding CNBC's decision to de-schedule Plaintiff from this evidence, which amounts to: (i) a single comment, (ii) made to her by another woman of color of Dominican heritage, (iii) who hired her and (iv) thereafter not only repeatedly excused her lateness, but even changed her starting time, and (iv) which was made "early" in her 16-month assignment to CNBC, long

before she accumulated an uncontroverted record of lateness detrimental to her employer's interests.  That dog won't hunt.

### 3.  Plaintiff Has Failed to Offer Evidence That Her De-Scheduling Was Pretextual

Nonetheless, even if this isolated comment—made by someone who is a member of two of the same protected classes as Plaintiff—were sufficient to make out a prima facie case, all the evidence in the record shows Velazquez was de-scheduled for persistent lateness.  Plaintiff does not identify any evidence that her chronic lateness was a pretext for anything, let alone race, color, or national origin discrimination.  (*See* discussion of FLSA and NYLL retaliation claims, *supra*.)

Accordingly, the Court grants summary judgment to Defendants dismissing Velazquez's Section 1981 and NYSHRL claims.

### B.  Race and Color Discrimination Claims Under the NYCHRL (Counts Nine and Ten)

Plaintiff's municipal discrimination claims fail for the same reasons that her federal and state claims do:  she has failed to make a prima facie case of race or color discrimination.  "'A plaintiff must still link the adverse employment action to a discriminatory motivation' to withstand summary judgment on her NYCHRL claim." *Varughese v. Mount Sinai Med. Ctr.*, No. 12-cv-8812, 2015 WL 1499618, at *40 (S.D.N.Y. Mar. 27, 2015), *aff'd*, 693 F. App'x 41 (2d Cir. 2017) (quoting *Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 258 (E.D.N.Y. 2012), *aff'd*, 713 F.3d 163 (2d Cir. 2013)).  "Where a plaintiff cannot do so, her claims fail." *Sotomayor*, 862 F. Supp. at 258.  Even if she had been able to, moreover, she has introduced no evidence that her termination was the result of anything other than her persistent tardiness.

The Court therefore grants summary judgment to Defendants dismissing Plaintiff's NYCHRL claims.

## VII.    Conclusion

For the reasons stated above, the Court GRANTS Defendants' motion for summary judgment.

The Clerk of Court is respectfully requested to close the motion at Docket Number 97 and to close the case.

Dated: March 15, 2019

_____
Chief Judge

BY ECF TO ALL PARTIES